[Civ. No. 474. Fourth Appellate District.—September 22, 1931.]

STORM & BUTTS, a Copartnership, etc., et al., Respondents, v. E. C. LIPSCOMB et al., Defendants; MARYLAND CASUALTY COMPANY (a Corporation), Appellant.

8

Stearns, Luce & Forward, Albert J. Lee and Fred Kunzel for Appellant.

Harvey H. Atherton for Respondents.

ALLISON, J., *pro tem.*—This appeal is from a judgment against the defendants. The action grows out of a controversy between the original contractors and their sureties, as plaintiffs, against subcontrators and their surety, in the matter of the construction of an ocean front walk and boulevard erected and constructed at Mission Beach, in the city of San Diego, under the provisions of the 1911 Improvement District Act (Stats. 1911, p. 730). In taking the necessary proceedings and letting the contract the city divided the work in question into two units, one known as the south unit and the other as the north unit. The south unit constituted about one-third of the work. Charles and F. W. Steffgen were the low bidders on what is known as the north unit. They immediately assigned their contract to the plaintiffs, Storm & Butts, who became the contractors for the entire work and gave bonds with the Indemnity Insurance Company of North America as surety. The plaintiffs, Storm & Butts, sublet a portion of said work to the defendants Lipscomb & Dutton for driving the concrete piling and making back fills. The city had furnished a complete set of plans and specifications for the doing of the work. These were furnished to the defendants Lipscomb & Dutton by Storm & Butts and they had a copy of said

plans and specifications in their possession at and prior to submitting the memorandum bid to Storm & Butts for driving the concrete piles and making the back fill. This bid was made prior to the awarding of the contract by the city. Subsequent to the entering into of the contract by Storm & Butts with the city of San Diego, said Storm & Butts addressed a letter, dated March 18, 1927, to Lipscomb & Dutton, which referred to the bid which had theretofore been made by Lipscomb & Dutton and outlined the amount to be paid for the work and the manner of payment, which was accepted in writing by Lipscomb & Dutton. Pursuant to said memorandum contract and as a part thereof, Lipscomb & Dutton furnished a bond to Storm & Butts with the Maryland Casualty Company as surety.

No other plans or specifications except the plans and specifications furnished and supplied by the city of San Diego were used by Lipscomb & Dutton in preparing their memoranda bid and in driving the piling and doing said work under said subcontract. No other written agreement of any kind was ever entered into between Storm & Butts and Lipscomb & Dutton, or between the superintendent of streets of the city of San Diego and Lipscomb & Dutton, for doing the work any differently than as provided for in said plans and specifications. It appears that Lipscomb & Dutton, after making said contract, proceeded with the driving of the piling, but had considerable difficulty from the beginning in getting said piling down according to specifications, and complaint was being made from time to time by the inspector for the city and street superintendent that some of the pilings were broken and others had to be replaced. When the work was about half completed the superintendent of streets of the city stopped the further doing of the work by Lipscomb & Dutton for the reason, as stated by him, of the unsatisfactory manner in which they were attempting to drive the piling and demanded of them that they comply with the specifications of the city as to the manner of equipment to drive said piling. It appears that Lipscomb & Dutton had not complied with the specifications as to pressure of water used or as to weight of hammer in driving and neglected to do so, whereupon the superintendent of streets stopped the work. Storm & Butts demanded that they, Lipscomb & Dutton, as well as the Maryland Casualty Company, complete said subcontract

and comply with said specifications, but they and each of them neglected and refused to do anything further, whereupon Storm & Butts proceeded to install proper equipment and complete the work. Arrangements were made by Storm & Butts and the Indemnity Insurance Company of North America, their surety, with the Municipal Bonding Company to advance money as required by them from time to time for the doing of said work, as the financing agent of Storm & Butts. Security was given to the Municipal Bonding Company to protect it in advancing money, and all moneys advanced by the Municipal Bonding Company were fully repaid to it by the sale of bonds issued by the city for the doing of said work, the balance being paid in cash by the Indemnity Insurance Company of North America prior to the commencement of this action. At the time of the commencement of this action the Municipal Bonding Company had no interest and claimed no interest in the subject matter of this action.

The complaint sets out the two contracts entered into by the superintendent of streets for the construction of the two sections of the seawall; the giving of the bonds for the performance of the contracts by the Indemnity Insurance Company of North America; the letting of the said subcontract to the defendants Lipscomb & Dutton and the giving of a bond for the faithful performance of their contract by the Maryland Casualty Company; the agreement of Lipscomb & Dutton to do the work in accordance with the original contract and the plans and specifications supplied by the city; the failure of Lipscomb & Dutton to perform the work provided in their contract, in that they failed to drive said piling and to do said work in accordance with the plans and specifications furnished by the city of San Diego for doing the same, and that said Lipscomb & Dutton did not perform the work in a diligent and proper manner and that as a result the said Storm & Butts had been required to spend an additional sum of money to the amount of $5,000 for the completion of other portions of said work which were not included in the subcontract, more than they would have been required to pay had Lipscomb & Dutton properly performed said contract; that the work was entirely abandoned by Lipscomb & Dutton on or about the first day of August, 1927; that the said subcontractors were repeatedly requested to complete their work

and the appellant, the Maryland Casualty Company, had been notified of their default and demand had been made upon that company to proceed with said subcontract, which demand had been refused, whereupon the plaintiffs Storm & Butts took possession of said work and proceeded to complete the same; and prays for judgment against Lipscomb & Dutton for moneys expended in the completion of said work in the sum of $30,339.34, and also a judgment against the Maryland Casualty Company for $18,000 with interest.

The answer admitted the execution of the various original contracts with the superintendent of streets and the giving of the bonds by the Indemnity Insurance Company of North America; also the assignment of the Steffgen contract to the plaintiffs Storm & Butts, but denied all other allegations. An amendment was by leave of court filed in which the defendants allege that the contract between plaintiffs Storm & Butts and the superintendent of streets had been assigned and that the plaintiffs had parted with all their rights in said contract by way of assignment and that Storm & Butts were without any interest upon which they could maintain the action. During the course of the trial a second amendment to the answer was filed, in which the defendants allege that the contract between Storm & Butts and Lipscomb & Dutton was based in part upon a memorandum in writing. Neither did the memorandum bid nor said contract of March 18, 1927, set forth the specifications under which the work by Lipscomb & Dutton was to be performed. It is further alleged by way of defense that the firm of Storm & Butts stated and represented to the defendants Lipscomb & Dutton, that in performing the work specified in said agreement they might use and they would be permitted to use, in driving the piles referred to, water from the city mains instead of sea water as specified in the contract between Storm & Butts and the city of San Diego. It is further alleged that the said Storm & Butts further stated and represented that the defendants Lipscomb & Dutton might use pile drivers different in size and capacity than the pile drivers specified in the contract between Storm & Butts and the city of San Diego, and that the bid submitted by Lipscomb & Dutton was based upon said representations in order that the bid of Storm & Butts to the city might be reduced in amount, and that it was understood that if said piles were driven through

the use of sea water and hammers of different size and capacity from those specified, such method would require a considerable expenditure of money and would greatly increase the bid of Storm & Butts.

 It is contended by the appellant that the evidence is not sufficient to justify the decision of the court in finding as a fact, that the plans and specifications prepared and furnished by the superintendent of streets and upon which the original contractors based their contract to perform the work in question were considered and became a part of the contract between Storm & Butts and Lipscomb & Dutton. The contract reads as follows: .

"Phone Main 8281

. "Alf J. Storm W. M. Butts

"Storm & Butts
"General Contractors and Engineers
"521 A Street .
"San Diego, California

"March 18, 1927.

"Messrs. Lipscomb & Dutton,
 "West Santa Fe Wharf,
 "San Diego, California.
"Gentlemen:

"It is now possible for us to consummate the letting of the contract of the Mission Beach seawall, upon which you gave us a quotation.

"It is our understanding that you will accept the concrete piles to be driven on this work when they are deposited within 150 feet of the point where they are to be driven; that you are to do all of the excavating required and all of the back filling and wetting down for the fill inside between the front wall and the rear wall of the structures for both sections for the sum of Thirty-five Thousand Six Hundred Thirty-five ($35,635.00) Dollars.

"It is further understood that you will make the back fill required behind the wall on the South section for 30¢ per cubic yard. It is understood at this time that the filling behind the wall in the North section will be subject to future arrangements which we may make with yourselves or others.

"It is further understood that you are to use two pile driving outfits and that you will place these piles as fast as

possible. We, on our part, will do everything possible to expedite the work.

"It was the understanding at the time you submitted your sub-bid to us that you would furnish a Surety Bond for the entire amount of your subcontract in order that we might be protected. It is the understanding now that you will deliver such a bond to us within ten days.

"It is further agreed that Storm & Butts are to advance 85 per cent of the estimated amount of completed work every two weeks, a particular week day to be named by Lipscomb & Dutton and to be adhered to. It is also agreed that Lipscomb & Dutton are to pay the current rate of interest on any moneys advanced to them during the progress of the work.

"Trusting that this contract will prove profitable to both of us, we are,

"Very truly yours,
"STORM & BUTTS,
"By ALF. J. STORM, W. M. BUTTS.

"Accepted
"LIPSCOMB & DUTTON
"By E. C. LIPSCOMB
"E. E. DUTTON."

The bid referred to is in writing, and is as follows:

"Approx 6104 Piles driven

"All excavating south of amusement center necessary for all forming.

"All back filling for entire length of wall necessary to fill between front & back walls.

$35,635.00

"Back fill behind back wall 30¢ per yard."

Pursuant to the said memorandum contract and as a part thereof, Lipscomb & Dutton furnished a bond to Storm & Butts with the Maryland Casualty Company as surety, which recites in part as follows:

"The Condition of this obligation is such that, whereas, the said Obligee, on the 1st day of March, 1927, entered into a written contract with City of San Diego for the construction and completion of the Mission Beach Sea Wall, Mission Beach, California.

"Whereas, said Principal on the 18th day of March, 1927, entered into a written subcontract with said Obligee, for the

driving of the piles and the excavation incidental thereto, the back filling and wetting down for the fill inside between the front and rear walls and for the back filling for the rear wall in the South Section of the said Sea Wall, on the public work covered in said written contract hereinabove mentioned.

"Whereas, the said Obligee in connection with and as a part of the consideration for the contract first above mentioned has been required to make, execute and file a bond for the performance of his contract and also a labor and material bond pursuant to the provisions of the Act of Legislature of the State of California, entitled 'An Act to secure the payment of the claims of materialmen, mechanics, or laborers, employed by contractors upon state, municipal, or other public work', approved March 27th, 1897, as the said act was amended by Acts of the Legislature of the State of California, approved May 1, 1911, and May 29, 1915, respectively.

"Now, therefore, if the above bounden Principal shall well and truly perform the work contracted to be done under said subcontract between him and said Obligee, and shall hold the said Obligee free and harmless from and against all loss or damage under the labor and material bond hereinbefore mentioned which shall arise by reason of the failure of said Principal, to pay claims arising in connection with the said subcontract, then this obligation to be null and void, otherwise to remain in full force and effect."

Appellant contends that the subcontract of March 18, 1927, being in writing, contains the full agreement between the parties except in so far as the memoranda bid might add anything thereto and that no other writings or documents can properly be considered as forming a part thereof, for the reason that no reference is made in said contract to any other writings or documents. The bond in question is a part of the contract, was given in pursuance of the terms thereof, and must be read in connection therewith (*Roberts* v. *Security T. & S. Bank,* 196 Cal. 557 [238 Pac. 673]; *W. P. Fuller* v. *Alturas S. Dist.,* 28 Cal. App. 609 [153 Pac. 743]; *Callan* v. *Empire State Surety Co.,* 20 Cal. App. 483 [124 Pac. 978, 981]). It will be noted in reading the bond that it provides that the principal, Lipscomb & Dutton, had entered into a written subcontract with Storm

& Butts to do a certain part of the public work covered in a written contract between Storm & Butts and the city of San Diego. Both documents refer to the contract as a subcontract. The subcontract in question is an agreement on the part of Lipscomb & Dutton to perform a part of the obligation which Storm & Butts owed by their contract to the city of San Diego. Separate instruments may be shown by oral evidence to constitute but one transaction, ''even when there is in either of the instruments no reference of the fact that another instrument accompanies it'' (*Hancock* v. *Clark,* 56 Cal. App. 277 [204 Pac. 1098]). (See, also, *Spotton* v. *Dyer,* 42 Cal. App. 585 [184 Pac. 23]; sec. 1642, Civ. Code.) An inspection of the documents making up the subcontract will disclose that they make no pretense of being complete. No provisions are therein made for the manner in which the work was to be done or what piling is to be driven or how far apart or to what depth they were to be driven, whether they should be placed in line or in groups, etc. In all these particulars and in many others the contract is silent. The court found that at the time of making the subcontract of March 18, 1927, and prior thereto, Lipscomb & Dutton had in their possession a copy of the plans and specifications in question, which included the work agreed to be done by Lipscomb & Dutton, and that said plans and specifications were considered and became a part of said contract. At the trial of the case the plaintiffs were permitted to show by oral testimony that the plans and specifications were from the inception of the contract accepted by Lipscomb & Dutton as the basis of all their dealings on the subject matter, that they formed the basis of their bid and were consulted during the construction of the work. The plaintiffs do not seek to contradict by parol proof the covenants of the contract in question. ''In its execution, every executory contract requires more or less of a practical construction to be given it by the parties, and when this has been given, the law, in any subsequent litigation which involves the construction of the contract, adopts the practical construction of the parties as the true construction, and as the safest rule to be applied in the solution of the difficulty'' (*Mitau* v. *Roddan,* 149 Cal. 1 [6 L. R. A. (N. S.) 275, 84 Pac. 145]. [Citing *Mayberry* v. *Alhambra etc. Co.,* 125 Cal. 446 [54 Pac. 530, 58 Pac. 68];

*Keith* v. *Electrical Engineering Co.*, 136 Cal. 181 [68 Pac. 598]). "It is a well-settled rule of law that when the meaning of the language of a contract is doubtful the construction which the parties to it place upon it during the course of its execution will be adopted where the language will reasonably permit such an interpretation" (*Kales* v. *Houghton*, 190 Cal. 294 [212 Pac. 21, 23]. See, also, *United States Trading Corp.* v. *Newmark G. Co.*, 56 Cal. App. 176 [205 Pac. 29]; *Laiblin* v. *San Joaquin Agr. Corp.*, 60 Cal. App. 516 [213 Pac. 529]; *Kennedy* v. *Lee*, 147 Cal. 596 [82 Pac. 257].) We are of the opinion that there was no error in admitting the testimony in question.

It is next contended by the appellant that the specifications were waived and that the subcontract was altered without the consent of the Maryland Casualty Company, and that the surety company was thereby released from liability. We are unable to agree with the appellant in this respect. An examination of the record discloses ample evidence to the effect that the specifications were not waived and were by all parties considered an integral part of the contract, down to the time when the operations were stopped by the superintendent of streets. It will be remembered that the contracts in question were in writing. There could be no subsequent alteration binding on the parties unless the same were in writing or by an executed oral contract (sec. 1698, Civ. Code). There is no claim that there was any writing affecting the contract in question after giving the bond on March 25, 1927, and it cannot be seriously contended that there was any executed oral agreement, for the reason that the work was only half done. "An executed oral agreement is one the terms of which have been fully performed" (*Henehan* v. *Hart*, 127 Cal. 656 [60 Pac. 426]). It is not claimed, however, that there was any change in the contract as to the work but only as to the method of performing it. The trial court found as a fact against this contention and we perceive no grounds for disturbing the court's finding in that respect.

It is next contended that Storm & Butts are not proper parties plaintiff, for the reason that the original contract executed by them with the city of San Diego for performing the work was assigned to the Municipal Bonding Company as security for advancing them money from

time to time as the work progressed. The only relation the Municipal Bonding Company had with Storm & Butts and the Indemnity Insurance Company of North America was that of financial agent, by advancing money for labor and material as the work progressed, for which they charged interest and which was reimbursed to them with money received from sale of bonds issued by the city in payment of the work. The balance was paid to the Municipal Bonding Company on behalf of Storm & Butts by the Indemnity Insurance Company of North America in cash, prior to the commencement of this action. The trial court found that the Municipal Bonding Company was fully repaid and reimbursed prior to the commencement of this action and had executed a release and reassignment of the said contract to Storm & Butts, and the said bonding company did not have or claim any interest by virtue of said assignment in said contracts, or either of them. "Notwithstanding an agreement to the contrary a lien or contract for a lien, transfers no title to the property subject to the lien" (sec. 2888, Civ. Code). "While a pledgee has a special property or interest in a pledge, the title or general property remains in the pledgor, notwithstanding an apparent transfer of legal title or condition broken. He is not divested of his title in assigned securities merely by force of an assignment thereof" (21 Cal. Jur. 328). In passing upon a similar question the Supreme Court held the assignment was by way of security only and the plaintiff still had an interest in the property assigned and was therefor a proper party plaintiff. To the same effect see *Stackpole* v. *Pacific Gas & Elec. Co.*, 181 Cal. 700 [186 Pac. 354]; *Allen* v. *Chatfield*, 34 Cal. App. 785 [168 Pac. 1149]; *Webb* v. *Casassa*, 82 Cal. App. 307 [255 Pac. 541].

It is next urged that the Indemnity Insurance Company was not subrogated to the rights of Storm & Butts by reason of the payment by said company to the Municipal Bonding Company for the use and benefit of Storm & Butts. It will be remembered that the Indemnity Insurance Company executed certain bonds by which it became obligated to see that the contracts of Storm & Butts were fully performed; that the Municipal Bonding Company acted as the financial agent of Storm & Butts, the bonding company in turn being secured for all payments to be made by it. A

part of the advances made by the bonding company was repaid by the sale of certain bonds issued by the city for doing said work. The balance remaining was paid by the Indemnity Insurance Company before the commencement of this action. Appellant insists that the Indemnity Insurance Company is by reason of said payment subrogated to the rights of the bonding company but not to the rights of Storm & Butts, and therefore are not proper parties plaintiff in this suit. Section 2777 of the Civil Code provides that he "who indemnifies another against an act to be done by the latter, is liable jointly with the person indemnified, and separately, to every person injured by such act". Section 378 of the Code of Civil Procedure provides "All persons having an interest in the subject of the action, and in obtaining the relief demanded, may be joined as plaintiffs." Section 369 of the Code of Civil Procedure provides that a "trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the persons for whose benefit the action is prosecuted. A person with whom, or in whose name, a contract is made for the benefit of another, is a trustee of an express trust, within the meaning of this section". The rules pertaining to subrogation are clearly stated in the Civil Code as follows:

"A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, . . ." (Sec. 2849, Civ. Code.)

"A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal. . . . " (Sec. 2848, Civ. Code.) We believe the rights of the Indemnity Insurance Company were subrogated to the rights of Storm & Butts in this suit. This conclusion is amply sustained by the following cases: *Estate of Elizalde,* 182 Cal. 427 [88 Pac. 560]; *Fresno Investment Co.* v. *Brandon,* 79 Cal. App. 387 [249 Pac. 548]; *Title Guar. etc. Co.* v. *Duarte,* 54 Cal. App. 260 [201 Pac. 790].

It is next urged that the court erred in admitting into evidence the daily report sheets kept by Storm & Butts during the progress of the completion of the work of the Lipscomb & Dutton subcontract. It appears that

after Storm & Butts took over the work, they operated under three full eight-hour shifts. The time-books and records were kept by the witness Smith, who was the time-keeper of the work. This witness was only a part of the time on the work in question. The time-book and time sheets covering the time that the timekeeper was not on the work himself were made up from information obtained from the foreman in charge of the work and were, as a rule, contained in memorandums made on slips of paper of a temporary nature. These memorandums were not preserved by the bookkeeper and were not produced at the trial. Neither was the foreman who supplied the memorandums produced at the trial. The witness Smith testified as to the system employed on the work, how the time sheets were made out, and it appears from his testimony that he kept in close touch with the progress of the work. He checked up on the time of the men employed at least twice a day and personally made the entries from the memorandums supplied by the foreman and night staff. It appears that the system of keeping of the time of the force of men employed and other items of expense was complete and comprehensive, and were such records as are usually kept by construction companies engaged in construction work of the kind in question. The witness testified that the records made by him were correct. These daily reports were admitted into evidence over the objection of the defendants, the objections going principally to those portions thereof as are based on information obtained by the witness from the foreman on the work at the time when he was not there. The foreman kept this data for Smith, the timekeeper, under his direction. These memorandums and time sheets were made up daily. It clearly appears that the records made up from the memorandums in the manner stated, would constitute original records. (See sec. 1947, Code Civ. Proc.) In the case of *Chan Kiu Sing* v. *Gordon*, 171 Cal. 28 [151 Pac. 657], the Supreme Court lays down the rule for the establishing of the proper foundation for the admission of such evidence, to the effect that the books in question must be kept in the regular course of business; that the business is of a character in which it is proper or customary to keep such books; that the entries were original entries or the first permanent entries of the

transaction; that they were made at the time or within reasonable proximity of the time of the respective transactions; and that the person making them had personal knowledge of the transactions or obtained such knowledge from a report regularly made to him by some other person employed in the business, whose duty it was to make the same in the regular course of business. The question of the admissibility or records of similar origin to those under consideration is fully considered in the case of *Patrick* v. *Tetzlaff*, 46 Cal. App. 243 [189 Pac. 115]. Under the authority of that case we believe the evidence was clearly admissible and that the court committed no error in so ruling.

It is next urged that the plaintiffs should have been precluded from introducing evidence as to the accounts sued on, because of the alleged failure to furnish a bill of particulars. It appears that upon the demand of defendants a bill of particulars was supplied and filed. The defendants in due time demanded a further bill of particulars and statement of account, and, upon motion, the court thereafter made an order requiring the plaintiffs to file a further bill. The plaintiffs, in compliance with said order, served and filed a further bill, which the defendants insist is not a sufficient compliance with the court's order. It appears that prior to the trial of the case, a representative of the appellant Maryland Casualty Company was given free access to all of the daily reports and records in the possession of the plaintiffs, made copies thereof and took such data as he desired, and that the defendants had full and complete information of the contents of all the records and vouchers that were offered in evidence, long before the case came to trial. Assuming that the defendants were entitled to be furnished with a copy of the original records and accounts, the failure of the plaintiffs to supply such copies is without prejudice to the defendants if they were already in possession of the original accounts rendered by the plaintiffs (*Auzerais* v. *Naglee*, 74 Cal. 60 [15 Pac. 371]). In the case of *McCarthy* v. *Mt. Tecarte Land & Water Co.*, 110 Cal. 687 [43 Pac. 391], an attempt was made to preclude testimony offered in support of the accounts sued on, on the ground that the bill of particulars was served six days after demand therefor or one day later than the statute contemplates, but forty days before the trial. In sustaining the trial court in admitting the

evidence in question over objection, the court says: "We are referred to no authority construing the provisions of such a statute as mandatory; but, on the other hand, it is uniformly held that the language serves but to name a penalty vesting the discretionary power of exacting it or not in the sound discretion of the trial judge. (*Robbins* v. *Butler*, 13 Colo. 496 [22 Pac. 803].) In *Graham* v. *Harmon*, 84 Cal. 181, 185 [23 Pac. 1097], it is said that the penalty only applies where the party refuses to furnish the copy; and in *Conner* v. *Hutchinson*, 17 Cal. 279, it is held that if the bill of particulars is for any reason objectionable, and the adverse party proposes to object to the introduction of evidence, he may not wait until the trial but previous to the trial must move for and obtain an order excluding the evidence. Such is also the rule laid down in *Kellogg* v. *Paine*, 8 How. Pr. (N. Y.) 329, and in *Isham* v. *Parker*, 3 Wash. 774 [29 Pac. 835]. This defendant failed to do, and for that additional reason his objection was properly overruled."

If a party is not satisfied with the bill of particulars because it is defective either in form or substance, he should immediately return it or move the court for a further or amended bill (*Dennison* v. *Smith*, 1 Cal. 437). We are of the opinion that the defendants could not be prejudiced by the fact that the plaintiff did not furnish them with a copy of the records and data which they already had in their possession.

Appellant has suggested other points in its brief but has neither argued nor seriously presented them. It is held in *Dolley* v. *Ragon*, 66 Cal. App. 707 [228 Pac. 52], that in such circumstances, under the rule frequently announced by the Supreme Court of this state, such alleged errors as are not argued and seriously presented are entitled to no consideration. (See cases there cited.)

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 16, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 19, 1931.